Filed 12/21/20  P. v. Williams CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KATHRYN WILLIAMS,<br><br>    Defendant and Appellant. | D076556<br><br><br>(Super. Ct. No. SCE372771) |


APPEAL from a judgment of the Superior Court of San Diego County, Lantz Lewis, Judge.  Affirmed.

Eric R. Larson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, and Michael Pulos and Seth M. Friedman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Kathryn Williams of first degree murder (Pen. Code, §§ 187, subd. (a), 189, subds. (a), (e))[1] and found true the special-circumstance allegation that the murder was committed during a robbery (§ 190.2, subd. (a)(17)).  The jury also convicted Williams of robbery (§ 211) and, as to both murder and robbery, found that another principal in the offenses was armed (§ 12022, subd. (a)(1)).  Williams admitted that she was out on bail at the time of the offenses.  (§ 12022.1, subd. (b).)  The trial court sentenced Williams to life imprisonment without the possibility of parole, plus one year.

Williams was tried together with a codefendant, Derrick Henderson. Williams's murder conviction was based on the theory of felony murder, with Henderson as the actual killer.  The jury convicted Henderson of first degree murder and robbery as well.  Henderson's convictions are not at issue here; they are the subject of a separate appeal.  (See *People v. Henderson* (D076834, app. filed Nov. 8, 2019).)

In this appeal, Williams contends (1) the evidence does not support her first degree murder conviction (and related special-circumstance allegation) because the required element of reckless indifference to human life is lacking, and (2) the court provided erroneous and misleading instructions to the jury regarding the timing of Williams's intent to commit robbery in relationship to the murder.  We disagree with these contentions and affirm.

FACTS

For purposes of this section, we state the evidence in the light most favorable to the judgment.  (See *People v. Banks* (2015) 61 Cal.4th 788, 795

---

[1]     Subsequent statutory references are to the Penal Code.

(*Banks*).)  Additional facts will be discussed where relevant in the following section.

Williams knew the victim, Travis Lewis, because she had purchased marijuana from him a number of times in the past.  On July 20, 2017, Williams called Lewis on an unregistered ("burner") cell phone.  They arranged to meet in the parking lot of a Burlington Coat Factory store in La Mesa, California.  Williams told Lewis she wanted to buy marijuana.  This was a ruse.  Williams owed money to her girlfriend, Tiesha Johnson, and intended to rob Lewis to pay her back.  Williams enlisted Henderson, who Williams described as her cousin, to aid in the robbery.  Williams called Johnson and asked for a ride to meet Lewis.  Williams told Johnson she wanted to "hit a lick" to get money to repay her.  In this context, Johnson understood "hit a lick" to mean that Williams would steal something, either pills or money.[2]

With her daughter in the front passenger seat, Johnson picked up Williams and Henderson.  Henderson was visibly high, likely on methamphetamines.  He was also armed, with a .380 caliber semiautomatic pistol.  Johnson did not know Henderson was armed, though Williams did.  Williams believed Henderson would use the pistol to scare Lewis.

Johnson drove Williams and Henderson to the Burlington Coat Factory parking lot and dropped them off near Lewis's car.  It was daytime, the store was open, and shoppers walked to and from their cars.  Johnson left the lot and parked at a nearby motel.  She later said, "I didn't want to be in the middle of what they were doing."

---

[2]  Johnson was charged with murder as a codefendant.  As part of a plea deal, the prosecution agreed to dismiss the murder charge in exchange for Johnson's testimony at trial and her guilty plea to the charge of robbery.

Henderson went to the driver's side of the car, where Lewis was sitting. Williams got in the passenger seat. Henderson showed Lewis a pill bottle, ostensibly because he wanted to sell some pills. An argument ensued, and Williams may have exited the car. She stood either on the passenger side or near the trunk. Henderson leaned into the car, drew his pistol, and pressed it against Lewis's neck. Soon afterward, Henderson fired the pistol. A bullet entered the left side of Lewis's neck and exited near his right ear, shattering the car's rear window. After the shooting, Henderson pulled the trunk release and joined Williams at the back of the car. They looked in the trunk and each grabbed a shopping bag. The shopping bags were later found to contain valuable, newly-purchased designer shoes.

Lewis staggered out of the car and asked a passing driver for help. The driver called paramedics. Lewis collapsed in the parking lot, bleeding profusely. Williams approached him, feigning concern. She said, " 'Oh are you okay, dude? Oh my God you're bleeding a lot.' " Instead of helping him, however, Williams turned Lewis facedown and calmly went through his pockets. She found Lewis's wallet and cell phone and took them.

Henderson walked away, toward the motel where Johnson had parked. He dropped the pistol in a planter box. Williams followed, dropping Lewis's cell phone (covered in blood) in a different planter box. On the way, Williams handled some money, losing at least one twenty-dollar bill. They both carried the shopping bags they had taken from Lewis's trunk. A witness said Williams " 'walk[ed] that way like nothing happened, so cool.' "

Henderson got back to Johnson's car first. He told Johnson, "I done[']d the dude," but Johnson did not believe him. Johnson saw Williams and picked her up. Williams told Henderson, " 'You didn't have to do that. I had him.' " Henderson responded that he was protecting Williams. Williams

4

smiled and laughed, but she also looked scared (as did Henderson). Johnson dropped off Henderson and Williams at Henderson's girlfriend's apartment. After Henderson got out, Williams gave Johnson $360 and told her she would give her the rest later.

Meanwhile, paramedics came to Lewis's aid, but he had already died. His cause of death was later determined to be homicide, as a result of a gunshot wound to the neck. Police arrived and began their investigation. They subsequently obtained surveillance video of the parking lot and numerous phone records.

Later on the day of the murder, Williams asked Johnson to pick her up to go shopping. They went to a clothing store, where Williams bought an outfit, some undershirts, and some underwear. Johnson dropped Williams off at Henderson's girlfriend's apartment again. That night, Williams asked Johnson for help getting a motel room. They went out to eat at Denny's, bought some "blunts" for smoking marijuana, and arrived at the motel. At the motel, they saw police cars, which made Williams nervous. Williams tried to hide a large amount of cash, more than Johnson had ever seen her have before. Williams told Johnson about the plan to rob Lewis. She claimed the pistol was only to scare him. But, Williams added, she did not feel bad about Lewis's death because he had robbed her before and now she got him back.

A few days later, Williams and Johnson were arrested in Johnson's car. In the car, police found one pair of the stolen shoes. In Williams's sock, police found $653. After their arrest, Williams told Johnson to say she did not remember anything.

At trial, Williams testified in her own defense. She claimed she asked a friend to set up the meeting with Lewis to buy some marijuana. She denied

5

any plan to rob or steal from him, and she claimed not to know Henderson was armed. She thought Henderson wanted to sell Lewis some pills. She said Henderson unexpectedly drew his pistol and said, " 'Give me your shit.' " Before Lewis could respond, Henderson shot him. Williams claimed Henderson started ordering her around, first to the trunk (to grab a shopping bag) and then to Lewis (to find anything in his pockets). Williams said Henderson was waiving his gun and threatening to hurt her and her family if she did not comply. Williams took Lewis's wallet, but it was empty. She denied taking Lewis's cell phone. Afterward, Henderson was angry because they did not get any money, only shoes. When Johnson dropped them off at Henderson's girlfriend's apartment, Williams was scared but Henderson told her to get out of the car. Henderson took both pairs of stolen shoes. Inside the apartment, Henderson told her not to say anything. Later, Williams called Johnson to pick her up. They went to an ATM, and Williams withdrew approximately $1,000. She did not know how one pair of stolen shoes got into Johnson's car.

## DISCUSSION

### I

### *Reckless Indifference to Human Life*

Williams contends the evidence does not support her conviction for first degree murder (or the related special-circumstance allegation) because it does not show she acted with reckless indifference to human life. "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record

6

independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*Banks*, *supra*, 61 Cal.4th at p. 804.) "We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*People v. Clark* (2016) 63 Cal.4th 522, 610 (*Clark*).)

A murder "that is committed in the perpetration of, or attempt to perpetrate, . . . robbery" is murder in the first degree. (§ 189, subd. (a).) Under the felony-murder rule, as relevant here, first degree murder liability extends to a "participant in the perpetration or attempted perpetration" of a robbery if "[t]he person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (§ 189, subd. (e)(3).)

Section 190.2 defines the special circumstances under which a defendant may be sentenced to death or life imprisonment without the possibility of parole. Included in this section is the felony-murder special circumstance, which applies to "every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a [specified felony, including robbery,] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor" if the murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, a specified felony. (§ 190.2, subd. (d).)

Thus, under current law, if a defendant is not the actual killer and did not act with intent to kill, both a first degree murder conviction and the

7

felony-murder special circumstance require that the defendant (1) be a major participant in the underlying felony and (2) act with reckless indifference to human life.  (§§ 189, subd. (e), 190.2, subd. (d); *People v. Solis* (2020) 46 Cal.App.5th 762, 774-775; *People v. Superior Court* (*Gooden*) (2019) 42 Cal.App.5th 270, 276.)  An exception exists for first degree murder liability when the victim is a peace officer killed in the course of performing his or her duties, but that exception is not applicable here.  (§ 189, subd. (f); *Solis*, at p. 775, fn. 3; *Gooden*, at p. 276, fn. 3.)

This standard reflects "the holding of *Tison v. Arizona* (1987) 481 U.S. 137 [(*Tison*)], which articulates the constitutional limits on executing felony murderers who did not personally kill.  *Tison* and a prior decision on which it is based, *Enmund v. Florida* (1982) 458 U.S. 782 [(*Enmund*)], collectively place conduct on a spectrum, with felony-murder participants eligible for death only when their involvement is substantial and they demonstrate a reckless indifference to the grave risk of death created by their actions." (*Banks*, *supra*, 61 Cal.4th at p. 794.)  *Tison* approved of the death penalty for two felony-murder defendants who orchestrated a prison break for two convicted murderers, supplied them with deadly weapons, flagged down a passing car, robbed the car's occupants at gunpoint, and then stood by and watched as the freed murderers shot them.  (*Tison*, at pp. 139-141, 151-152.)  *Enmund*, by contrast, disapproved of the death penalty for a felony-murder defendant who was no more than a getaway driver, sitting "in the car by the side of the road at the time of the killings, waiting to help the robbers escape." (*Enmund*, at p. 788.)

Our Supreme Court built on the holdings in *Tison* and *Enmund* to define the elements of major participation and reckless indifference in California.  (See *In re Scoggins* (2020) 9 Cal.5th 667, 675 (*Scoggins*); *Clark*,

8

*supra*, 63 Cal.4th at pp. 609, 616; *Banks*, *supra*, 61 Cal.4th at pp. 794, 801.) "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Banks*, at p. 802.) Although many of these opinions speak in terms of the death penalty, their principles are equally applicable here. (See *id*. at p. 795; see also §§ 189, subd. (e), 190.2, subd. (d).)

"The ultimate question pertaining to being a major participant is 'whether the defendant's participation "in criminal activities known to carry a grave risk of death" [citation] was sufficiently significant to be considered "major" [citations].' [Citation.] Among the relevant factors in determining this question, we set forth the following: 'What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inactions play a particular role in the death? What did the defendant do after lethal force was used?' " (*Clark*, *supra*, 63 Cal.4th at p. 611.)

Williams concedes the evidence supports the jury's determination that she was a major participant in Lewis's robbery, but we note these considerations because major participation in an armed robbery is relevant to the inquiry into reckless indifference. While such participation does not by itself prove reckless indifference, the fact of major participation " 'often provide[s] significant support for such a finding.' " (*Clark*, *supra*, 63 Cal.4th at p. 615.)

9

"Reckless indifference to human life has a subjective and an objective element.  [Citation.]  As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.'  [Citations.]  As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation." '  [Citation.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death" ' satisfies the statutory requirement.  [Citation.]  Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life."  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

We analyze the totality of the circumstances to determine whether the evidence supports the jury's determination that Williams acted with reckless indifference to human life.  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)  "Relevant factors include:  Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force?  What efforts did the defendant make to minimize the risks of violence during the felony?  [Citation.]  ' "[N]o

10

one of these considerations is necessary, nor is any one of them necessarily sufficient." ' " (*Ibid*.)

In *Scoggins*, our Supreme Court recently considered the element of reckless indifference in the context of a habeas corpus petition. (*Scoggins*, *supra*, 9 Cal.5th at p. 671.) The petitioner Scoggins, angry that someone had defrauded him, recruited several friends to " 'beat the shit' out of [the victim], and get Scoggins's money back." (*Ibid*.) "The plan did not call for Scoggins to be involved in the attack; Scoggins was concerned that [the victim] might recognize him from their earlier encounter and thought his presence would raise [the victim's] suspicions. There is no evidence that the plan involved the use of weapons." (*Ibid*.) One of the friends, however, carried a gun to the planned robbery. (*Id*. at p. 672.) After speaking briefly with the victim, the friend pulled out the gun and fired several shots. (*Ibid*.) The victim ran, but the friend continued firing and killed him. (*Ibid*.) The friend drove away with several other accomplices. (*Ibid*.) Scoggins was not present, but he was apparently nearby. "After the shooting, Scoggins walked over to [the victim] and checked if he was still breathing. At that point, several bystanders had already gathered around [the victim] and had called the police. After speaking with the bystanders for a while, Scoggins moved his car and returned to the crime scene. The police arrived and interviewed Scoggins as a witness. The officer who interviewed Scoggins described him as cooperative." (*Ibid*.)

Considering the totality of the circumstances in light of the factors enumerated above, the Supreme Court concluded that the evidence did not support a finding that Scoggins acted with reckless indifference to human life. (*Scoggins*, *supra*, 9 Cal.5th at pp. 677-683.) It found persuasive that "Scoggins did not use a gun, nor did he know that a gun would be used during

11

the felony" (*id*. at p. 677), "Scoggins was not physically present at the crime scene and was not in a position to restrain [his friend]" (*id*. at p. 678), his post-shooting behavior "could suggest that he had not planned for his accomplices to kill" the victim (*id*. at p. 680), there was "no evidence that Scoggins knew [his friends were] likely to use lethal force" (*id*. at p. 681), and the circumstances of the crime—daytime, in a public parking lot, in the possible presence of witnesses—"might reasonably be thought to keep his accomplices within the bounds of the plan" (*id*. at p. 683).

Similarly, in *Clark*, our Supreme Court found insufficient evidence of reckless indifference where the defendant planned the robbery but was not present when the murder occurred. (*Clark*, *supra*, 63 Cal.4th at p. 623.) The defendant's absence prevented him from "observ[ing] [the shooter's] response to [the victim's] unanticipated appearance or to intervene to prevent her killing" (*id*. at p. 619) and from "observ[ing] anything in [the shooter's] actions just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence" (*id*. at p. 621). The Supreme Court noted that the defendant had taken several steps to minimize the risk of violence, including that the robbery was planned to take place at a commercial establishment after closing time, that the gun used in the robbery would be unloaded, and that, while the gun turned out to be loaded, it was only loaded with one bullet. (*Id*. at pp. 621-622.) The knowledge that a gun would be used was not, without more, sufficient to show reckless indifference to human life. (*Id*. at p. 618.)

In *Banks,* our Supreme Court reversed a felony-murder special-circumstance finding because the evidence showed neither that the defendant was a major participant in the underlying robbery nor that the defendant acted with reckless indifference to human life. (*Banks*, *supra*, 61 Cal.4th at

pp. 804-811.) The defendant was "no more than a getaway driver," with no role in planning the robbery or procuring weapons. (*Id*. at p. 805.) "During the robbery and murder, [defendant] was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Ibid*.) Defendant "knew he was participating in an armed robbery. But nothing at trial supported the conclusion beyond a reasonable doubt that [defendant] knew his own actions would involve a grave risk of death." (*Id*. at p. 807.) The murder "was apparently a spontaneous response to armed resistance from the victim." (*Ibid*.)

Here, by contrast, the totality of the circumstances supports the reasonable inference that Williams acted with reckless indifference to human life. We examine each of the relevant factors in turn, keeping in mind that none of the factors is necessary and none is necessarily sufficient.

*Knowledge of weapons, and use and number of weapons.* Williams knew that Henderson would be armed. Although she did not wield a weapon herself, she planned the robbery and intended for Henderson to use a firearm to scare Lewis. The mere fact that Williams knew Henderson was armed is not, standing alone, sufficient to prove reckless indifference to human life. (See *Banks*, *supra*, 61 Cal.4th at p. 809.) But it is a relevant factor. (See *Clark*, *supra*, 63 Cal.4th at p. 618.)

*Physical presence at the crime and opportunities to restrain the crime or aid the victim.* Unlike the getaway drivers in *Banks* and *Enmund*, or the ringleaders in *Scoggins* and *Clark*, Williams was present at the scene when the murder took place. "Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry." (*People v. Garcia*

13

(2020) 46 Cal.App.5th 123, 148.) Moreover, there is no evidence that she attempted to restrain Henderson, prevent the shooting, or aid Lewis afterward. Williams's actions after the shooting are indirect evidence of her mental state. (See *Scoggins*, *supra*, 9 Cal.5th at p. 679.) The jury could reasonably find that Lewis's shooting had no visible effect on Williams. She and Henderson continued the planned robbery. Henderson opened the trunk, and they stole Lewis's newly-purchased designer shoes. After Lewis staggered out of his car and fell to the ground, Williams feigned concern but continued with her plan. She calmly turned him over, so he was facedown in his own blood, and went through his pockets. This action further endangered Lewis, who was already mortally wounded. Williams stole Lewis's wallet and cell phone, which was covered in his blood. Williams walked calmly away, discarded the cell phone, and began taking money from the wallet. While Williams's statements when she got in Johnson's car show that she did not necessarily desire Lewis's killing, this fact is not dispositive. (See *In re Loza* (2017) 10 Cal.App.5th 38, 54 (*Loza*) [finding reckless indifference notwithstanding defendant's "surprise[]" and " 'hysterical' demeanor" after the shooting].) Williams's actions and demeanor after the shooting show that she was not disturbed by it. Her comments to Johnson afterward, that she did not feel bad about Lewis's death, confirm this interpretation. A jury could reasonably infer that Williams anticipated death could result and went forward with the robbery anyway.

Williams claims that the shooting was "a sudden and inexplicable act." The jury was not required to accept this characterization of the events. Instead, based on Williams's actions before and after the shooting, and Henderson's time at Lewis's window, the jury could have found that the

14

shooting was neither sudden nor inexplicable and Williams fully anticipated that her robbery could result in death.

Williams also claims that the significance of her failure to aid Lewis is "diminished" because there were numerous bystanders and Lewis's injury was so severe that he could not have been saved anyway. We disagree. Attempts to aid the victim (or lack thereof) are significant because they provide indirect evidence of the defendant's mental state. Without more, a defendant's failure to aid the victim may not show reckless indifference to human life if the victim already has a very good chance of being aided by others. (See *Clark*, *supra*, 63 Cal.4th at p. 620 [failure to aid less important where defendant saw arriving police car and he "would have known that help in the form of police intervention was arriving"].) But here, there is more. Regardless whether Lewis could have been aided by others, the jury could reasonably have interpreted Williams's shocking actions after the shooting as indicative of her mental state of reckless indifference to human life. Unlike in *Scoggins* and *Clark*, the jury could find that Williams's actions were not ambiguous. (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 680; *Clark*, at p. 620.)

*Duration of the felony*. Although the robbery was fairly quick, Henderson and Williams interacted with Lewis for a time before the shooting occurred. It was not a split-second event. And, Williams extended the robbery after the shooting by approaching Lewis, turning him over, going through his pockets, and stealing his wallet and cell phone. In addition to further endangering Lewis, Williams's actions prolonged the risk to innocent bystanders in the parking lot.

*Knowledge of cohort's likelihood of killing*. The evidence showed that Henderson was visibly high on methamphetamines. Johnson testified that Henderson was "tweaking"; he was constantly moving his mouth and his eyes

15

were "big." Williams, too, noticed Henderson was "tweaking." She testified, "His mouth was working. He had kind of like a twist to his body. He couldn't be still." Williams had seen Henderson use both cocaine and methamphetamines in the past. Thus, going into the robbery, Williams knew Henderson was high on methamphetamines, armed with a handgun, and likely to act impulsively and irrationally. While there was no evidence regarding Henderson's history of violence, the jury could infer that Henderson's likelihood of killing under these circumstances was unreasonably high, and Williams knew it. (See *Loza*, *supra*, 10 Cal.App.5th at p. 53 [discussing the risks of an armed accomplice who is "jumpy and jittery"].)

*Efforts to minimize the risks of the violence during the felony*. Williams planned the robbery, and a reasonable jury could find that she did little to minimize its risks. Williams chose to stage the robbery during the day in a populated parking lot, with numerous innocent bystanders around. Unlike in *Scoggins*, *supra*, 9 Cal.5th at page 683, these circumstances heighten the risk of violence, rather than lessen them, because Williams planned an armed robbery, rather than an unarmed one (see *Clark*, *supra*, 63 Cal.4th at p. 621 [citing "risk of interlopers" as a relevant consideration]). Williams chose to involve Henderson specifically for his capacity for violence. She wanted him to bring a handgun and wield it during the robbery. Williams did not ensure the handgun was unloaded, which would have been sufficient for her plan to scare Lewis, and she continued with her plan even though Henderson was visibly "tweaking." Henderson and Williams positioned themselves outside Lewis's car so that Lewis had little means to escape, thereby heightening the risk of a violent confrontation. After Lewis was shot, Williams prolonged the robbery, further endangering both Lewis and innocent bystanders, and she

16

did nothing to aid Lewis. A robbery is inherently risky, but the jury could reasonably find that Williams did little to minimize those risks and, as discussed above, much to increase them.

Based on the evidence presented at trial, and considering the totality of the circumstances, the jury could reasonably find that Williams acted with reckless indifference to human life. We therefore reject Williams's contention that the evidence did not support her conviction for first degree felony murder and the related felony-murder special circumstance. (§§ 189, subd. (e), 190.2, subd. (d).)

## II

### *Jury Instructions*

Williams next contends the trial court erred in its jury instructions on first degree felony murder. The court's principal instruction on this offense was modeled after CALCRIM No. 540B. It provided, in relevant part, as follows: "To prove that the defendant is guilty of first-degree murder under this theory, the People must prove the following: One, the defendant committed, aided, or aided and abetted the crime of robbery; [two,] the defendant Kathryn Williams intended to commit or intended to aid and abet the perpetrator in committing the crime of robbery; three, if the defendant Williams did not personally commit the robbery, then a perpetrator whom the defendant was aiding and abetting committed robbery; four, while committing or aiding and abetting the crime of robbery, the perpetrator caused the death of another person; five, the defendant's participation in the robbery began before or during the killing; and, finally . . . the defendant was a major participant in the robbery and the defendant participated in the robbery and when she participated in the robbery, she acted with reckless indifference to human life. [¶] . . . [¶] The defendant must have intended to

17

commit or aided and abetted the felony of robbery before or at the time that the perpetrator caused the death. [¶] The crime of robbery continues until all defendants have reached a place of temporary safety. Again, I will describe that in another instruction, what the definition of temporary safety means. [¶] It is not required that the person die immediately as long as the act causing death occurred while the defendant was committing the felony." The court also instructed the jury on general aiding and abetting (CALCRIM Nos. 400 and 401) and robbery (CALCRIM Nos. 1600, 1603, and 3261).

Williams argues the jury instructions were erroneous because (1) they "failed to convey to the jury that when there is some delay between the act that causes death and the victim's actual death, what matters for purposes of assigning felony murder liability is the time of commission of the act that resulted in the victim's death, even if death did not immediately result" and (2) they "erroneously incorporated and affirmatively advised the jury that the crime of robbery for felony murder purposes continues during the carrying away of the stolen property until a place of temporary safety is reached." Williams did not object on these grounds in the trial court.

"We review de novo whether a jury instruction correctly states the law." (*People v. Bates* (2019) 35 Cal.App.5th 1, 9.) "Once we have ascertained the relevant law, we determine the meaning of the instructions in this regard. Here the question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526.)

18

As noted, Williams's first claim of error is that the instructions "failed to convey to the jury that when there is some delay between the act that causes death and the victim's actual death, what matters for purposes of assigning felony murder liability is the time of commission of the act that resulted in the victim's death, even if death did not immediately result." Williams is correct that felony murder liability does not attach to defendants who join the felony only after the actual killer murders the victim. "Although the second person is an accomplice to robbery [citation], such participation in the robbery does not subject the accomplice to murder liability under section 189, because the killer and accomplice were not 'jointly engaged at the time of such killing' in a robbery [citation]; the killer, in other words, was not acting, at the time of the killing, in furtherance of a 'common' design to rob." (*People v. Pulido* (1997) 15 Cal.4th 713, 716.) We will assume, without deciding, that a felony murder defendant who joins the felony only after the acts that resulted in the victim's death (regardless of the timing of the death itself) is not generally liable for the victim's murder. "[W]hat matters for purposes of felony-murder liability has always been the time of the commission of the acts that resulted in the victim's death, even if death did not immediately result." (*People v. McDonald* (2015) 238 Cal.App.4th 16, 25 (*McDonald*).)[3]

In *McDonald*, the trial court instructed the jury with CALCRIM No. 540B, but it omitted the bracketed paragraph that told the jury the defendant must have intended to commit or aid and abet the underlying

---

[3] The Attorney General describes *McDonald*'s view on this issue as "debatable," but he accepts it for purposes of this appeal. Because we conclude the judgment should be affirmed even accepting *McDonald*'s interpretation, we need not consider whether the Attorney General's criticism is valid.

19

felony " 'before or at the time that [the perpetrator] caused the death.' " (*McDonald*, *supra,* 238 Cal.App.4th at pp. 22-23.) The reviewing court found this to be error. The omitted paragraph "was a correct statement of the law and was factually applicable to the present case." (*Id*. at p. 25.) As given by the trial court, the instructions erroneously "permitted defendant to be found guilty of felony murder even if he did not aid and abet the robbery until after commission of the act that caused [the victim's] death." (*Id*. at p. 27.) The reviewing court found this error to be prejudicial, and it reversed the judgment. (*Id*. at p. 32.)

Here, unlike in *McDonald*, the trial court provided the jury with the bracketed paragraph from CALCRIM No. 540B. It told the jury, "The defendant must have intended to commit or aided and abetted the felony of robbery before or at the time that the perpetrator caused the death." It "was a correct statement of the law and was factually applicable to the present case." (*McDonald*, *supra*, 238 Cal.App.4th at p. 25.) Contrary to Williams's claim, the trial court correctly instructed the jury that she must have formed the intent to commit or aid and abet the robbery before or at the time Henderson caused Lewis's death.

Williams admits the trial court "appropriately" gave the bracketed paragraph from CALCRIM No. 540B. But she claims the language "was not entirely clear" regarding the timing requirement. Williams focuses on other language, that her participation in the robbery must have begun " 'before or during the killing,' " to argue that the jury instructions were ultimately "ambiguous" regarding the timing of Williams's intent. Williams forfeited this argument by failing to request clarification in the trial court. (*People v. O'Malley* (2016) 62 Cal.4th 944, 991.) Even setting aside forfeiture, Williams has not shown error. *McDonald* considered a nearly identical issue. While

20

the trial court in *McDonald* omitted the bracketed paragraph from CALCRIM No. 540B, it did tell the jury that the defendant's participation in the robbery must have begun "before or during *the killing*" (the same language Williams challenges here). (*McDonald*, *supra*, 238 Cal.App.4th at p. 28.) *McDonald* held that this language was ambiguous because the jury might have interpreted it to require only that defendant's participation precede the victim's "*death itself*, and not the act that caused her death." (*Id*. at p. 29, fn. omitted.) Crucially, *McDonald* explained that the bracketed paragraph of CALCRIM No. 540B would have cured this ambiguity "because it would have clarified that the critical moment for felony-murder complicity was commission of the act causing death, not death itself." (*Id*. at p. 29.) Because the trial court here gave the bracketed paragraph, any ambiguity was in fact cured. There is no reasonable likelihood the jury interpreted the instructions to require only that Williams must have intended to commit or aid and abet the robbery before Lewis actually died.

In her second claim of error, Williams argues that the trial court's felony murder instructions "erroneously incorporated and affirmatively advised the jury that the crime of robbery for felony murder purposes continues during the carrying away of the stolen property until a place of temporary safety is reached." So framed, this argument does not identify any error. The crime of robbery, for felony murder purposes, does continue until a place of temporary safety is reached: " 'Felony-murder liability continues throughout the flight of a perpetrator from the scene of a robbery until the perpetrator reaches a place of temporary safety because the robbery and the accidental death, in such a case, are parts of a "continuous transaction." ' " (*People v. Wilkins* (2013) 56 Cal.4th 333, 345.)

21

Despite this framing, Williams's concern again appears to be the timing of her intent to commit or aid and abet the robbery in relationship to Lewis's death. She points out that the trial court instructed the jury with CALCRIM No. 1603, which the authors specifically caution courts not to use if the defendant is charged with felony murder. In relevant part, that instruction provided as follows: "To be guilty of robbery as an aider and abettor, a defendant must have formed the intent to aid and abet the commission of the robbery before or while the perpetrator carried away the property to a place of temporary safety."

While it is true that the bench notes to CALCRIM No. 1603 caution against using this language when the defendant is charged with felony murder, the bench notes do not have the force of law. (See *People v Alvarez* (1996) 14 Cal.4th 155, 223, fn. 28.) In any event, CALCRIM No. 1603's discussion of intent is directed at liability for *robbery* as an aider and abettor. CALCRIM No. 540B, including its bracketed language, informed the jury of the intent required for liability on the charge of *murder*. The bracketed paragraph in CALCRIM No. 540B imposed an additional requirement, above and beyond the requirement that Williams commit or aid and abet the robbery, in order to find Williams guilty of murder. She "must have intended to commit or aided and abetted the felony of robbery before or at the time that the perpetrator caused the death." The inclusion of this language distinguishes this case from *People v. Esquivel* (1994) 28 Cal.App.4th 1386, 1399, in which "*no* instruction given informed the jury that [defendant] had to have formed the intent to participate in the robbery before the murder was committed in order to be found guilty of felony murder." There is no reasonable likelihood the jury interpreted the trial court's instructions to require, for felony murder liability, only that Williams must have intended to

22

commit or aid and abet the robbery sometime before she and Henderson reached a place of temporary safety, regardless of the timing of the act that caused Lewis's death.[4]

DISPOSITION

The judgment is affirmed.


GUERRERO, J.

WE CONCUR:



BENKE, Acting P. J.



HALLER, J.

---

[4]    In her discussion of the prejudice resulting from her claimed instructional errors, Williams relies on the prosecutor's alleged misstatement of the law on this issue.  Because Williams has not shown error, we need not consider prejudice, and Williams does not contend that the prosecutor's argument was itself prejudicial error.  We note the jury was instructed to disregard any comments on the law contrary to its instructions, and we presume the jury heeded this admonition.  (See *People v. Meneses* (2019) 41 Cal.App.5th 63, 75.)